```
            IN THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF MARYLAND

LAWRENCE B. GONZALES,           :

       Plaintiff,               :

v.                              :
                                    Civil Action No. GLR-13-3551
TRUCK DRIVERS AND HELPERS       :
LOCAL 355 RETIREMENT PENSION
FUND,                           :

       Defendant.               :
```

**MEMORANDUM OPINION**

THIS MATTER is before the Court on Plaintiff Lawrence Gonzales's Motion for Summary Judgment (ECF No. 13), and Defendant Truck Drivers and Helpers Local 355 Retirement Pension Fund's (the "Fund") Cross-Motion for Summary Judgment (ECF No. 14). The Court, having reviewed the pleadings and supporting documents, finds no hearing necessary. See Local Rule 105.6 (D.Md. 2014). Gonzales's Motion for Summary Judgment will be granted and the Fund's Cross-Motion for Summary Judgment will be denied because the Fund's denial of benefits to Gonzales constitutes an abuse of discretion.

## I. BACKGROUND[1]

The Fund is a multi-employer employee retirement benefit plan that provides post-employment income to participants and

---

[1] Unless otherwise noted, all facts are taken from the administrative record. All record citations correspond with the bates number listed in the administrative record ("AR").

designated beneficiaries.  At all times relevant to this action, Gonzales was a participant in the Fund's pension plan (the "Plan") by virtue of his employment with Airborne Express and DHL.

On December 31, 1997, Gonzales was lifting boxes when he tripped on a hand cart, which caused him to jerk awkwardly while trying to catch himself before hitting the ground (the "1997 work injury").  On January 8, 1998, Gonzales consulted Dr. Langlois of the Total Health Chiropractic Center complaining of lower back pain.  (AR at 24).  Dr. Langlois continued to treat Gonzales until July 20, 1998, when his symptoms were reduced to a mild level, but Gonzales reported residual weakness in his lower back.  (Id.).  With the exception of January and February, Gonzales continued to work at least 150 hours per month during this treatment period. (AR at 66-67).  Gonzales also worked consistently from August 1998 through November 2003.  (AR at 64-66).

On November 4, 2003, Gonzales returned to Dr. Langlois complaining that the pain in his back again reached a moderate level.  (AR at 24).  Prior to Gonzales's return, a February 27, 2003 MRI evaluation revealed mild degenerative changes in the lumbar spine and disk bulging.  (AR at 25).  According to Dr. Langlois, after receiving treatment subsequent to his November 2003 complaints, Gonzales attempted to return to work on January

5, 2004, but was again taken off work on January 22, 2004, because his work activity caused severe discomfort. (AR at 24). Gonzales's work records show, however, that he worked at least 150 hours per month through January 2004. (AR at 64). Thereafter, the records indicate sporadic work activity at a rate of one to two months per year from 2005 through January 2008. (AR at 57).

From January 2004 through March 2009, Gonzales continued treatment with Dr. Langlois, consulted various specialists, and underwent surgery in July 2006, which was ultimately rendered a clinical failure. (See generally AR at 24-45, 77-81). The record contains several reports from Dr. Langlois, including an April 26, 2004 report in which he states "I have followed this case for more than six years and there has never been any clinical doubt that [Gonzales's] condition is a direct result of the work accident of 12/31/1997." (AR at 27). Similarly, on December 22, 2004, Gonzales saw Dr. Rosenthal of the Orthopaedic Specialty Center for an independent medical evaluation. Dr. Rosenthal concluded, "It is difficult to state that this comes from degenerative change, as the patient is only 40 years of age. Most likely, this is posttraumatic and is related to the injury of December 31, 1997." (AR at 437). In November 2006, Dr. Franchetti of Maryland Orthopedics, P.A. found that

3

Gonzales's issues with his lower back were "a result of the December 31, 1997 work injury." (AR at 38).

On March 19, 2009, the Social Security Administration ("SSA") held a hearing to determine whether Gonzales was eligible for disability benefits. (AR at 52). On April 1, 2009, Administrative Law Judge ("ALJ") William F. Clark determined that Gonzales was disabled as of his alleged disability date of January 14, 2004, and listed his disability as "[d]egenerative disc disease lumbar spine status post fusion with radiculopathy, dysthymic disorder" (the "SSA decision"). (AR at 54).

Thereafter, Gonzales submitted an application for disability retirement benefits, which the Fund denied on April 7, 2009 ("Initial Denial Letter"). (AR at 12-14). In that letter, the Fund articulated the Plan guidelines[2] and then stated

---

[2] The letter states,

Please be informed of the following requirements to qualify for a Disability Pension Benefit:

a. You must be determined to be totally disabled by the Social Security Administration
b. Disability due to Illness or Disease
   (i) You must have reached your 50th birthday; and
   (ii) Have earned at least 120 Future Service Benefits Credits. If you have at least 120 Future Service Benefit Credits but are between the ages of 47 and 50, you will be eligible for Disability Retirement when you reach your 50th birthday.
c. Disability Retirement due to Bodily Injury:
   (i) You must be under the age of 65; and

4

"[y]our Social Security Award list[s] your disability as [d]egenerative disc disease lumbar spine status post fusion with radiculopathy, dysthymic disorder . . . . You have not met the qualifications for a benefit based on Disability Guidelines." (AR at 13). On April 20, 2009, Gonzales filed an appeal of that denial. (AR at 10). In his appeal letter, Gonzales averred that his disability was due to the 1997 work injury, not degenerative disk disease, and attached various reports from his medical specialists. (Id.). The Fund denied Gonzales's appeal on August 17, 2009, stating the evidence Gonzales provided illustrated that his "disability was the result of illness or disease." (AR at 8). Slightly longer than a year later, Neil Novin, M.D. examined Gonzales for an independent medical evaluation. (AR at 449-51). Upon review of Gonzales's medical records and a physical examination, Dr. Novin concluded that Gonzales's impairments were "[f]ailed back syndrome with persistent L5-S1 bilateral radiculopathy warranting forty-six (46%) percent permanent partial impairment to the lumbar spine solely and wholly due to the accident of December 31, 1997." (AR at 451).

On June 8, 2012, Gonzales filed suit against the Fund in this Court seeking to recoup the denied disability benefits.

---

     (ii) Have earned at least 60 Future Service Benefit Credits.

See Gonzales v. Truck Drivers & Helpers Local 355 Ret. Pension Fund, GLR-12-1694 (D.Md. 2012) ("Gonzales I"). After the parties filed their cross-motions, the Court remanded the matter to the Fund for further proceedings because the record indicated that the Fund failed to provide Gonzales a full and fair review of his claims. (Gonzales I, ECF No. 21). Specifically, the Court concluded

> In its initial denial letter, the Fund articulated the Plan guidelines and then stated "Your Social Security Award list[s] your disability as [d]egenerative disc disease lumbar spine status post fusion with radiculopathy, dysthymic disorder . . . . You have not met the qualifications for a benefit based on Disability Guidelines." (A.R. 12-13). The administrative record, however, shows that the SSA determination was not the only factor the Fund considered. To the contrary, the May 22, 2009 e-mail of Employer Trustee, David Granek, states that he was "uncomfortable" with the timing of Gonzales'[s] injury and his work record after the SSA disability date. (A.R. 70). Moreover, the Fund's May 13, 2009 meeting minutes also note that Gonzales continued to work well after his SSA disability determination date. (A.R. 71). The length of time between the 1997 work injury and Gonzales'[s] disability date, as well as his continued work hours thereafter, appear to have contributed to the Fund's decision. The initial denial letter, however, states that the sole reason for the denial is the SSA determination. This letter contravenes the procedural mandates of ERISA because Gonzales should have been afforded an opportunity to address specifically the timing issue on appeal. Furthermore, the briefing in this case raises a related issue of causation—namely, whether the 1997 work injury caused the degenerative disk disease—that the Fund did not previously consider. The Fund's alleged reliance upon the SSA determination does not absolve it of its duty to ensure that participants are afforded a full and fair review of their claims.

6

(Id. at 3).

Upon remand, the Fund issued Gonzales a denial letter on May 3, 2013 ("Second Denial Letter"). (AR at 415-17). Unlike the Initial Denial Letter, however, the Fund outlined its reasoning. According to the Fund, Gonzales's disability is due to disease and not bodily injury because ALJ Clark "did not indicate that the prior injury resulted in [Gonzales's] disability" and "degenerative disc disease has been described as 'most often the result of a gradual, aging-related wear and tear' . . . your long period of full-time work in a manual labor job following what appears to be the date of your prior back injury further appears to indicate that your disability as determined by the [SSA] is a result of disease rather than bodily injury." (AR at 417). The Fund then directed Gonzales to submit information indicating the SSA was incorrect, that his full-time work as a delivery driver both before and after the injury did not contribute to the disease, and that the onset date occurred after his forty-seventh birthday. (Id.).

On June 6, 2013, Stanley Friedler, M.D. reviewed Gonzales's medical records and issued a corresponding report. (AR at 452-55). In that report, Dr. Friedler opined that "[t]he incident of 12/31/1997 started a process at the L5-S1 disk space, which led to the deterioration of that space with arthritic changes

7

and osteophyte formation." (AR at 455). Dr. Frielder concluded,

> I believe with all medical certainty and probability that Mr. Gonzales' problems with his low back, subsequent treatment and surgeries, and the deterioration of that disk space, were due to the injury of 12/31/1997. They are not due to an illness or disease. When patients have problems with a disk and it deteriorates and degenerative changes occur, this is frequently referred to as degenerative disk disease, but in fact, it is not technically a disease.

(Id.). Gonzales submitted his appeal of the Fund's Second Denial Letter on June 21, 2013, noting the findings of Doctors Rosenthal and Novin and attaching Dr. Friedler's report. (AR at 419-29).

The Fund denied Gonzales's appeal of it's Second Denial Letter on October 1, 2013. (AR at 508-10). According to the Fund, it was "unable to find any document . . . indicating the Administrative Law Judge's determination was incorrect." (AR at 509). The Fund was also unable to find "any document indicating that [Gonzales's] total and permanent disability . . . resulted from the injury rather than degenerative disc disease." (Id.) (emphasis in the original). In denying Gonzales's appeal, the Fund dismissed Doctors Novin, Rosenthal, and Friedler's conclusions as failing to indicate that Gonzales's total and permanent disability is a result of the work injury. (Id.). The Fund concluded that none of the records provided addressed whether Gonzales's work history contributed to the degenerative

8

disk disease. (Id.). As a result, the Fund stated "[b]ecause degenerative disc disease has been described as 'most often the result of a gradual, aging-related wear and tear' . . . the Fund concluded that your long period of full-time work delivering packages, both prior to and following the injury, caused, as much as any one evident factor, your total and permanent disability as determined by the [SSA]." (Id.).

Gonzales filed this suit against the Fund on November 25, 2013, again seeking the Court's review of the Fund's denial under the Employment Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 et seq. (2012). (ECF No. 1). Gonzales filed his Motion for Summary Judgment on April 11, 2014. (ECF No. 13). The Fund filed its Cross-Motion for Summary Judgment on May 2, 2014. (ECF No. 14).

## II. DISCUSSION

### A. Standards of Review

#### 1. Summary Judgment

Summary judgment is only appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). A "material fact" is a fact that might affect the outcome of a party's case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); JKC Holding Co. v. Wash. Sports Ventures, Inc., 264 F.3d 459, 465 (4th Cir. 2001). Whether a fact is

considered to be "material" is determined by the substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248; Hooven-Lewis v. Caldera, 249 F.3d 259, 265 (4th Cir. 2001). The Court must "draw all justifiable inferences in favor of the nonmoving party, including questions of credibility and of the weight to be accorded to particular evidence." Masson v. New Yorker Magazine, Inc., 501 U.S. 496, 520 (1991) (citing Anderson, 477 U.S. at 255).

   **2. ERISA**

It is undisputed that the proper standard of review in this matter is abuse of discretion. When "an ERISA benefit plan vests with the plan administrator the discretionary authority to make eligibility determinations for beneficiaries" the Court reviews the administrator's decision for abuse of discretion. Williams v. Metro. Life Ins. Co., 609 F.3d 622, 629-30 (4th Cir. 2010) (citing Champion v. Black & Decker (U.S.) Inc., 550 F.3d 353, 359 (4th Cir. 2008)). Under this standard, the Court will not disturb the administrator's decision if it is reasonable, "even if the court itself would have reached a different conclusion." Booth v. Wal-Mart Stores, Inc. Assocs. Health & Welfare Plan, 201 F.3d 335, 341 (4th Cir. 2000). A reasonable decision is one that results from a "'deliberate, principled

reasoning process' and [is] supported by substantial evidence." Williams, 609 F.3d at 630 (quoting Guthrie v. Nat'l Rural Electric Coop. Ass'n Long-Term Disability Plan, 509 F.3d 644, 651 (4th Cir. 2007)).[3]

Substantial evidence is defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966).

**B.  Analysis**

Because the parties agree that the abuse of discretion standard applies to this case, the only question before the Court is whether the Fund's determination that Gonzales's

---

[3] In Booth, the U.S. Court of Appeals for the Fourth Circuit established eight factors a court may consider in determining the reasonableness of an administrator's decision:

> (1) the language of the plan; (2) the purposes and goals of the plan; (3) the adequacy of the materials considered to make the decision and the degree to which they support it; (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan; (5) whether the decision making process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any external standard relevant to the exercise of discretion; and (8) the fiduciary's motives and any conflict of interest it may have.

201 F.3d at 342-43.

11

disability was caused by disease, not bodily injury, was an abuse of discretion. The Court concludes the Fund abused its discretion by relying on the ALJ decision and speculation while discounting the significant medical evidence in the record favoring Gonzales.

**1. The Plan Language**

Section 1.16 of the Plan defines a "disability" as

> [E]ither a physical or mental illness or disease, or bodily injury, which has lasted for a minimum of twenty-six (26) weeks, and which renders the Participant totally and permanently incapable of performing the majority of the important duties he or she was performing for the Participating Employer when such Disability began, and makes the Participant unable to engage in any substantial gainful activity, considering his or her age, education, and work experience.
>
> Furthermore, a Participant will be considered disabled for purposes of this Plan only when he or she has been determined to be total [sic] and permanently disabled for Social Security purposes and is entitled to receive disability benefits under Section 223 of the Social Security Act.

(AR at 224). The Plan does not provide definitions for the terms "disease" and "bodily injury." Gonzales contends that, under Maryland law, the Fund's failure to define these terms requires the Court to apply their usual and ordinary meaning. (See Pl.'s Mem. Supp. Mot. Summ. J. at 9-12, ECF No. 13-1). The Fund counters that the Plan grants its Trustees the discretion to interpret the Plan's terms and, in interpreting those terms, the Trustees correctly relied upon the SSA determination in

12

concluding the nature of Gonzales's disability was a disease. (Def.'s Reply to Pl.'s Opp'n to Cross-Mot. for Summ. J. at 6).

The Trustees also consulted an online definition of degenerative disc disease from the Mayo Clinic in concluding that it constituted a "disease" as applied in the Plan. The Mayo Clinic defines degenerative disc disease as "most often the result of a gradual, aging-related wear and tear." (AR at 417). In McCoy v. Holland, the United States Court of Appeals for the Fourth Circuit noted, in a United Mine Workers Pension Plan case,

> Degenerative disc disease is not a medical term of art. Instead, it is a "convenient label . . . applied carelessly to a variety of distinct [degenerative] processes of spinal joints." Degenerative diseases of the spinal joints commonly result from structural changes "in the vertebral bone and endplate, which occur with advancing age, [and] interfere with normal discal nutrition." . . . "Degenerative changes of the cervical spine are common after the age of 40 years and affect more than 70 percent of patients older than 70 years." Similarly, "[d]egenerative changes in the lumbar spine . . . [are] detected . . . in 60 to 80 percent of men and women by the sixth decade of life, and in about 100 percent of subjects by the age of 70 years."

364 F.3d 166, 168 n.3 (2004) (alteration in original) (emphasis added) (citations omitted) (quoting 3 Donald Resnick M.D., Diagnosis of Bone & Joint Disorders 1372, 1373 & 1407-08 (3d ed. 1995)).

As the Fourth Circuit noted, degenerative disc disease is not necessarily what one typically considers a "disease" under

13

its usual and ordinary meaning.  Moreover, Gonzales's affected area, the lumbar spine, is usually applies to older individuals.  Doctors Langlois and Frielder attempted to address that distinction in their reports.  Dr. Langlois stated, "If we were to discuss the generally accepted causes of these types of degenerative changes, the list would start with traumatic injury to the affected area.  It is also unquestioned that the nature of degenerative changes, just by the intrinsic meaning of the word 'degenerative,' is chronic and takes a long time to develop."  (AR at 25).  Similarly, Dr. Friedler wrote, "When patients have problems with a disk and it deteriorates and degenerative changes occur, this is frequently referred to as degenerative disk disease, but in fact, it is not technically a disease."  (AR at 455).

Therefore, although the Mayo Clinic definition the Fund used in reaching its decision is partially correct in noting degenerative disc disease is a gradual process, it does not provide the entire picture concerning the typical age of onset and that within this phrase, the term "disease" is not given its ordinary meaning.  With that in mind, the Court turns to the Fund's decision.

### 2. The Fund's Benefits Denial

The Fund's "substantial evidence" in this matter is the SSA decision, its speculation that the nature and length of Gonzales's work history may have contributed to his disability, and the Mayo Clinic's online definition of degenerative disc disease. In arguing that its reliance on this evidence does not constitute an abuse of discretion, the Fund makes three arguments: (1) the Plan treats SSA determinations with particular respect and deference; (2) Gonzales's long post-injury work history significantly contributed to his degenerative disc disease; and (3) the Fund's conflict of interest is immaterial. The record in this case belies the Fund's contention that it did not abuse its discretion in denying Gonzales's benefits request.

As a preliminary matter, it is undisputed that the Fund's dual role of claims evaluator and payor of those claims creates a conflict of interest. Although conflict of interest is a Booth factor the Court considers in determining the reasonableness of the Fund's decision, there is no indication this conflict influenced its decision. Further, Gonzales has not requested discovery to demonstrate the conflict's influence on the Fund's decisionmaking. See, e.g., Clark v. Unum Life Ins. Co. of Am., 799 F.Supp.2d 527, 533 (D.Md. 2011) ("The Court therefore holds that Glenn created an exception to the general

15

rule . . . that extra-record discovery is unavailable to ERISA plaintiffs. Such discovery is available when an administrator has a structural conflict of interest and information not contained in the record is necessary to enable the court to determine the likelihood that the conflict influenced the particular benefits decision at issue."). Upon review of the record, it appears that the plan administrators were more concerned with not believing Gonzales's story. (See, e.g., AR at 70) (email from David Granek stating, "In short, I am uncomfortable with his story . . . . What bothered me most was the timing of his alleged injury and the fact that he is recorded as to [sic] working for a year beyond when he claims he was disabled."). Therefore, the conflict of interest presented in this case will not be afforded any additional weight than the other Booth factors.

Turning to the administrative record, in its Second Denial Letter, the Fund harps on Gonzales's alleged failure to provide evidence that his age and work history did not contribute to his degenerative disc disease. Contrary to this alleged failure, however, there are several medical reports in the record that attribute the 1997 work injury to Gonzales's degenerative disc disease. In April 2004, after Gonzales became totally and permanently disabled, Dr. Langlois stated, "I have followed this case for more than six years and there has never been any

16

clinical doubt that [Gonzales's] condition is a direct result of the work accident of 12/31/1997." (AR at 27). Several months later, on December 22, 2004, Dr. Rosenthal concluded, "It is difficult to state that this comes from degenerative change, as the patient is only 40 years of age. Most likely, this is posttraumatic and is related to the injury of December 31, 1997." (AR at 437). Similarly, in November 2006, Dr. Franchetti found that Gonzales's issues with his lower back were "a result of the December 31, 1997 work injury." (AR at 38).

Each of these medical experts concluded that the 1997 work injury caused Gonzales's degenerative disc disease. Although they do not explicitly state whether the nature and length of Gonzales's work contributed to the disease, each had an opportunity to consider that work history and still concluded that the 1997 work injury was the empirical starting point of Gonzales's lower back issues.[4] In fact, the only evidence in the record to the contrary is a medical report authored by Stephen R. Matz, M.D. and referenced by Dr. Langlois. (See AR at 25-26). Ironically, the Fund neither relies upon nor references Dr. Matz's conclusions in either of its denial letters.

---

[4] In his April 26, 2004 report, Dr. Langlois even references the nature of Gonzales's work in the history section, which illustrates his knowledge of Gonzales's job. (See AR at 24) ("He did not feel as if he could continue working at his job, which consisted of frequent lifting of heavy boxes.").

17

The final report in the record that attributes the 1997 work injury to Gonzales's degenerative disc diseases is Dr. Friedler's June 6, 2013 report concluding, "The incident of 12/31/1997 started a process at the L5-S1 disk space, which led to the deterioration of that space with arthritic changes and osteophyte formation."  (AR at 455).  Because the Fund avers that Dr. Frielder's report was written for the sole purpose of perfecting Gonzales's claim, the Court merely notes that his report only corroborates what is already noted in the administrative record.

At bottom, the record contains reports from medical experts who have concluded that Gonzales's degenerative disc disease is attributed to the 1997 work injury.  The SSA decision fails to address causation and the Fund's speculation that the nature and length of Gonzales's work history contributed to the disease is not supported by anything in the record.  This is not a reasonable decision that resulted from a "'deliberate, principled reasoning process' . . . supported by substantial evidence." Williams, 609 F.3d at 630 (quoting Guthrie, 509 F.3d at 651).  Therefore, it was an abuse of discretion for the Fund to conclude the SSA decision and Gonzales's work history warranted a denial of benefits in the face of medical evidence to the contrary.

**III. CONCLUSION**

For the foregoing reasons, the Court, by separate Order, will GRANT Gonzales's Motion for Summary Judgment (ECF No. 13) and DENY the Fund's Cross-Motion for Summary Judgment (ECF No. 14).

Entered this 11th day of August, 2014

/s/
George L. Russell, III
United States District Judge
